# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHARITA W.,[1] | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | ) No. 18-CV-955 |
| | ) |
| NANCY A. BERRYHILL, Acting | ) Jeffrey T. Gilbert |
| Commissioner of Social Security, | ) Magistrate Judge |
| | ) |
| Respondent. | ) |

## AMENDED MEMORANDUM OPINION AND ORDER

Claimant Charita W. ("Claimant") seeks review of the final decision of Respondent Nancy Berryhill, Acting Commissioner of Social Security ("the Commissioner"), denying Claimant's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and Title XVI of the Social Security Act ("Act"). Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings including final judgment. [ECF No. 6]. The parties have filed cross-motions for summary judgment [ECF Nos. 12 and 26] pursuant to Federal Rule of Civil Procedure 56. For the reasons stated below, Claimant's Motion for Summary Judgment [ECF No. 12] is granted, and the Commissioner's Motion [ECF No. 26] is denied. This matter is remanded for further proceedings consistent with this Amended Memorandum Order and Opinion.[2]

---

[1] Pursuant to Internal Operating Procedure 22, the Court will identify the non-government party by using her or her full first name and the first initial of the last name.

[2] After this Court entered its Memorandum Opinion and Order [ECF No. 30] and Judgment [ECF No. 31] on January 7, 2019, the Commissioner filed a Motion to Alter or Amend Judgment [ECF No. 34]. On June 18, 2019, the Court granted the Commissioner's Motion to Alter or Amend Judgment [ECF No. 34] and issued an Order and Statement [ECF No. 39]. In light of the Court's Order and Statement [ECF No. 39], the Court now enters its Amended Opinion and Order forthwith.

## I. PROCEDURAL HISTORY

Claimant filed applications for DIB and SSI on October 10, 2013, alleging a disability onset date of June 10, 2013. (R. 144.) The applications initially were denied on February 24, 2014 (R. 167) and upon reconsideration on October 29, 2014 (177-84), after which Claimant requested an administrative hearing before an administrative law judge ("ALJ"). (R. 185.) On May 26, 2016, Claimant, represented by counsel, appeared and testified at a hearing before Administrative Law Judge ("ALJ") Luke Woltering. (R. 144.) Claimant also appeared and testified at a supplemental hearing on October 4, 2016. (*Id.*) The ALJ heard testimony at the supplemental hearing from impartial medical expert ("ME") Dr. Hugh Savage and vocational expert ("VE") Cheryl R. Hoiseth. (*Id.*)

On January 12, 2017, the ALJ granted Claimant's applications for DIB and SSI finding Claimant was disabled as of August 11, 2016, but not prior to that date. (R. 144-60.) The opinion followed the five-step evaluation process required by the Social Security Regulations ("SSRs").[3] 20 C.F.R. § 404.1520. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity ("SGA") since Claimant's alleged onset date of June 10, 2013. (R. 146.) The ALJ noted that there was evidence Claimant had engaged in some work activity since the alleged onset date. (R. 147.) At step two, the ALJ found Claimant had the severe impairments of hypertension, cardiovascular accident, syncope, neuropathy in feet, left shoulder separation, reduced hearing in the left ear, depression, and personality disorder. (*Id.*) The ALJ also found Claimant had the non-

---

[3] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); see 20 C.F.R. § 402.35(b)(1). Although the Court is "not invariably bound by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

severe impairment of a broken toe on the right foot. (*Id.*) At step three, the ALJ found that since the alleged disability onset date of June 10, 2013, Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of the one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.920(d)). (*Id.*) The ALJ then assessed Claimant's residual functional capacity ("RFC")[4] and concluded:

> Claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except: The Claimant can never climb ladders, ropes, or scaffolds. She can never crawl or kneel. She can occasionally climb ramps and stairs. She can frequently balance, stoop, and crouch. She can frequently reach overhead, handle, finger, feel, push, and pull with the bilateral upper extremities. She can operate foot controls frequently with the right lower extremity and occasionally with the left lower extremity. The Claimant can work in no more than moderate noise environments. She can never work around hazards, such as unprotected heights and exposed moving mechanical parts. She can understand, remember, and carry out simple, routine, and repetitive tasks. The Claimant needs to work in a low pressure and low stress work environment defined as one requiring only occasional and simple, work-related decision-making, adjustment to no more than occasional changes in a routine work setting. The Claimant can never work at a production rate pace, such as assembly line work.

(R. 150.) Based on this RFC, the ALJ determined at step four that Claimant could not perform any past relevant work. (R. 157.)

Finally, at step five, the ALJ found, prior to August 11, 2016 — which is the date Claimant's age category changed from being "a younger individual age 45-49" to "an individual closely approaching advanced age" — there were jobs that existed in significant numbers in the national economy that Claimant could perform. (R. 158.) Specifically, the ALJ found Claimant could work as an information clerk (DOT #237.367-046), an order clerk (DOT

---

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

3

#209.567-014), and a document preparer (DOT #209.587-018). (R. 159.) The ALJ then found that beginning on August 11, 2016, based on Claimant's changed age category, education, work experience, and RFC, there were no jobs that existed in significant numbers in the national economy Claimant could perform. (*Id.*) Because of this determination, the ALJ found Claimant was not disabled prior to August 11, 2016, but became disabled on that date and has continued to be disabled. (R. 159.) The Appeals Council declined to review the matter on January 11, 2018, making the ALJ's decision the final decision of the Commissioner, and therefore, reviewable by this Court under 442 U.S.C. § 405(g). *See Haynes v. Baumhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. (*Id.*) Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his or her decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 42 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even where there is adequate evidence in the record to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). In other words, if the

4

Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

### III. ANALYSIS

On appeal, Claimant asserts that the ALJ made three errors. First, Claimant contends the ALJ improperly assessed Claimant's RFC. Second, Claimant argues the ALJ erroneously disregarded evidence of Claimant's mental health condition. Third, Claimant asserts the ALJ's finding that Claimant could perform other work was not supported by substantial evidence.

A.   **Medical Opinion Evidence**

The Court first addresses Claimant's argument that the ALJ erred in giving great weight to Dr. Savage's medical opinion as a non-examining physician who did not review the entirety of Claimant's medical records. [ECF No. 13], at 11. Courts in this Circuit repeatedly have criticized an ALJ's decision to give great weight to a non-examining physician who bases his decision on a fraction of a claimant's medical records. *See Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) (remanding case where doctor did not examine patient and had "only reviewed a fraction of [Claimant's] treatment records that were available before [Claimant] submitted additional evidence"); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (criticizing ALJ's reliance on consulting physicians' conclusions that were based on incomplete medical evidence); *Campbell v. Astrue*, 627 F.3d 299, 309 (7th Cir. 2010) (same).

It is undisputed that Dr. Savage never examined Claimant. (R. 155.) While this fact is not dispositive, the fact that Dr. Savage also never saw over 2,500 pages of Claimant's additional medical records submitted after the hearing is sufficient cause for remand. Claimant's counsel, at the supplemental hearing on October 4, 2016, made the ALJ aware that he anticipated submitting an additional 3,439 pages of medical records from Rush Hospital. (R. 65.) These new records contained information that Claimant had an implantable loop recorder[5] inserted into her chest and underwent a videonystagmography.[6] (R. 1990, 2314.) The records also contained entirely new reports about syncopal incidents, another physician's diagnosis of depression, an audiogram that Dr. Savage did not review showing mild to moderate hearing loss, an electroencephalogram, and blood test results showing possible abnormalities. (R. 1442, 1445, 2286, 2322-2330, 2484, 2567, 2635.); *See McHenry v. Berryhill*, 2018 WL 6787324, at *3 (7th Cir. 2018) ("We have said repeatedly that an ALJ may not 'play[] doctor' and interpret 'new and potentially decisive medical evidence' without medical scrutiny.") (quoting *Goins*, 764 F.3d 677 at 680.)

The Commissioner responds to these new records by claiming they were "either duplicates of record materials reviewed by Dr. Savage or insignificant." [ECF No. 27], at 4. While the Court agrees that some of the medical records were duplicates of records Dr. Savage had seen, these new

---

[5] An implantable loop recorder is a type of heart-monitoring device that records heart rhythm continuously for up to three years. It records the electrical signals of the heart and allows remote monitoring by way of a small device inserted just beneath the skin of the chest. *Mayo Clinic*, Electrocardiogram, https://www.mayoclinic.org/tests-procedures/implantable-loop-recorder/pyc-20384986 (last visited 12/3/18).

[6] Videonystagmography testing is an assessment of balance function, which includes a series of tests that can assist in determining the cause of vertigo, disequilibrium and dizziness. The vestibular system, which is located in the inner ear, is indirectly assessed by recording eye movements through infrared goggles worn throughout the evaluation. Test results indicate if the vestibular system is responsible for causing dizziness and balance problems. *North Shore University Health Systems*, videonystagmography, https://www.northshore.org/otolaryngology-head-neck-surgery/adult-programs/audiology/testing/vng/ (last visited 12/3/18).

records also contained the results of other medical tests and records that Dr. Savage did not see. Dr. Savage also did not review Exhibits 22F through 27F, which are comprised of medical records from Rush University Hospital dated May 4, 2016 through December 2, 2016. (R. 9.) Neither the Court, the Commissioner, nor the ALJ can say these test results and records are insignificant or irrelevant without a medical review. *Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir. 1996) ("[A]s this Court counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."); *see also Meuser*, 838 F.3d at 912. In fact, these records contain, as stated above, multiple diagnostic test results that Dr. Savage himself stated he would like to review. (R. 52, 53, 60, 62.)

It is telling Dr. Savage repeatedly expressed the need for additional medical information and assessments. (R. 52, 53, 60, 62.) Dr. Savage himself stated: "I was so anxious to know how much — I would get an idea by knowing how much paper Rush is sending your way or how much is going to be coming to know if they found an area where they can really drill down." (R. 62.) Dr. Savage's statement illuminates three flaws in the Commissioner's position. First, Dr. Savage had a fraction of Claimant's medical records during his review. *Colvin*, 764 F.3d at 680. Second, the ALJ's decision to discount the significance of the implantable loop recorder and videonystagmography was based on the ALJ's weighing of medical evidence, not a medical expert's opinion. (R. 153.) Third, Dr. Savage did not have access to several tests that may have revealed medically significant information.

The Commissioner also asserts that Claimant's reliance on *Goins v. Colvin*, 764 F.3d 677 (7th Cir. 2014), is unavailing as *Goins* involved a new MRI that revealed additional and significant abnormalities not seen in a previous MRI. [ECF No. 27], at 5. The Commissioner says that because "the records cited by plaintiff showed *no* syncopal episodes or events," Claimant's case is factually

7

distinguishable from *Goins*. (*Id.*) Again, it is not necessarily for the Commissioner to say what is or is not medically significant. In addition, some of the records not reviewed by Dr. Savage show syncopal incidents after the loop recorder was implanted, which may or may not be medically significant. (R. 2635.) As stated above, it is not the province of the ALJ or Commissioner's counsel to determine whether the presence or absence of a medical episode or event along with other matters contained in the unreviewed medical records is medically significant; that job is reserved for the medical expert and other physicians of record.

The sheer volume of the records that Dr. Savage did not see is material and disconcerting. It would have been relatively easy for the ALJ to ask the medical expert to review thousands of pages of Claimant's medical records produced after the hearing, and there is no good reason given by the Commissioner or any other reason apparent in the record for the ALJ's failure to take that necessary step.

For these reasons, the Court concludes the ALJ did not properly evaluate the medical evidence in the record and erred by affording Dr. Savage's opinion great weight when Dr. Savage only reviewed a fraction of the medical records.

**B.     The ALJ's Questions to the Vocational Expert**

The Court next addresses Claimant's argument that the ALJ failed to properly evaluate the significance and severity of Claimant's syncope when developing his RFC and posing questions to the VE. [ECF No. 13], at 10. "Hypothetical questions posed to vocational experts ordinarily must include *all* limitations supported by medical evidence in the record." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). The Seventh Circuit has stressed that this rule is designed to ensure that VE testimony properly accounts for the jobs a claimant can actually perform in light of her

limitations. (*Id.*) An ALJ decision based on inaccurate hypothetical questions requires remand. *Young v. Barnhart*, 362 F.3d 995, 1005 (7th Cir. 2004).

Claimant relies on *Smith v. Astrue*, 638 F.Supp.2d 1036 (E.D. Ark. 2009), to argue that the ALJ failed to fully incorporate the true extent of Claimant's syncope into the assessment of her RFC. Both the claimant in *Smith* and Claimant in the present case have syncope of an undetermined etiology which the respective ALJs found to be a severe impairment. *Smith*, 638 F.Supp.2d at 1041; (R. 147.) In addition, both the claimant in *Smith* and in this case produced unrebutted evidence that they experienced syncopal accidents at unpredictable times. (*Id.*) (R. 963.) And, in both cases, the ALJs did not fully incorporate the true extent of each claimant's syncopal accidents into their hypothetical questions to the VE. (*Id.*) (R. 79-80.)

Here, the ALJ asked the VE to consider the following:

> [A] hypothetical individual of the claimant's age and education, beginning with the past that you described. And further assume that this individual can perform the full range of sedentary work as that term is defined in the regulations except cannot climb ladders, ropes or scaffolds; cannot crawl or kneel; can occasionally climb ramps and stairs; can frequently balance, stoop, and crouch. Can frequently reach overhead, handle, finger, feel, push and pull with the bilateral upper extremities; can operate foot controls frequently with the right lower extremity and occasionally with the left lower extremity; is limited to working in no more than moderate noise environments; cannot work around hazards such as unprotected heights and exposed moving mechanical parts . . . no more than occasional changes in a routine work setting and no work at a production rate pace such as assembly line work.

(R. 79-80.) Unlike the ALJ in *Smith*, the ALJ in this case failed to include a crucial piece of information in his hypothetical question: that Claimant was prone to "unexpected episodes of unconsciousness posing a danger to herself or others." *Smith*, 638 F.Supp.2d at 1041. In *Smith*, once the ALJ included this piece of information in his hypothetical question, the VE testified that "there is no work that a person with that limitation can perform" and the court opined that "as the

vocational expert's answer reveals, the true extent of [Claimant's] syncope is a crucial factor." (*Id.*) The Court finds this compelling as the ALJ in this case failed to fully account for the extent of Claimant's syncope in his questions to the VE. *Young*, 362 F.3d at 1005. Therefore, remand is necessary to determine the true extent of Claimant's syncope and its potential impact on her RFC.

### C. Mental Health Assessment

Claimant also contends that the ALJ improperly disregarded evidence of Claimant's mental health assessments. [ECF No. 13], at 15. Claimant advances two arguments to support her position. First, that the ALJ "effectively refused to consider evidence from 'other medical sources,'" when evaluating records from Ms. Loren Buford, Licensed Clinical Social Worker ("LCSW"). (*Id.*) Second, the ALJ ignored an assessment by Dr. Lyubov Burleson, a psychiatrist at Rush Hospital, who found Claimant had a depressive disorder. (R. 972.)[7] The Court will address each argument in turn.

Under SSR 06-3p, "non-medical" personnel include "licensed clinical social workers." SSR 06-3p. According to the Social Security Administration, "we will consider th[e] [opinions of non-medical sources] using the same factors listed in paragraph (c)(1) through (c)(6) in this section, not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a . . . nonmedical source depends on the particular facts in each case." 20 C.F.R. § 404.1527.[8] Based on the facts in this case, the ALJ was not required to consider

---

[7] In her opening brief, Claimant suggests that Dr. Burleson diagnosed Claimant with moderate depressive disorder not otherwise specified and personality disorder. *See* [ECF No. 13], at 15-16. For the reasons discussed herein and in the Court's Order and Statement dated June 18, 2019 [ECF No. 39], the Court is not persuaded that Dr. Burleson, in fact, diagnosed Claimant with a personality disorder.

[8] The "paragraph (c)(1) through (c)(6)" factors alluded to in 20 C.F.R. § 404.1527 come from 20 C.F.R. § 404.1527(c)(1)-(6). These factors include (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the extent to which medical

10

all of the factors listed under 20 C.F.R. § 404.1527(c)(1)-(c)(6). The ALJ properly found that Ms. Buford's opinion "appears inconsistent with [her] treatment notes from Christian Community Health Center," and Ms. Buford's opinion generally was inconsistent with the entirety of Claimant's mental health records. (R. 156.) The Court is not convinced the ALJ needed to go through the six enumerated factors in 20 C.F.R. § 404.1527 before assigning little weight to Ms. Buford's assessment and finds the ALJ acted properly.

The Court, however, is persuaded that the ALJ did not sufficiently explain why he discounted the opinion of Dr. Burleson, a psychiatrist, who examined Claimant. Under SSR 06-3p, a "medical source" is defined as a "licensed physician (medical or osteopathic doctors)," a category that Dr. Burleson falls under as a psychiatrist. As such, the ALJ was required to determine what weight to give Dr. Burleson's opinion by considering a variety of factors, including: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the extent to which medical evidence supports the opinion; (4) the degree to which the opinion is consistent with the entire record; (5) whether the physician was a specialist in the relevant area; and (6) other factors that validate or contradict the opinion. *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014); 20 C.F.R. § 404.1527(c)(1)-(6).

The ALJ's opinion is devoid of any analysis of these factors. In fact, the ALJ's opinion does not even mention Dr. Burleson's name, and instead, merely states that "I give little weight to the Global Assessment of Functioning ("GAF") scores ranging from 51 to 61 contained in the

---

evidence supports the opinion; (4) the degree to which the opinion is consistent with the entire record; (5) whether the physician was a specialist in the relevant area; and (6) other factors that validate or contradict the opinion.

medical record." (R. 155.) These GAF scores were assigned by Dr. Burleson, but the ALJ gave no reason for discounting Dr. Burleson's assessment (R. 972).

The Commissioner argues that "Dr. Burleson did not offer any opinion in the first place." [ECF No. 27], at 8. Although Dr. Burleson may not have offered a formal medical opinion, he assessed Claimant's GAF scores and diagnosed Claimant with "depressive disorder not otherwise specified," and it is not clear why the ALJ did not give any weight to Dr. Burleson's assessment when examining Claimant's mental health records. *See Scrogham v. Colvin*, 765 F.3d at 698-700 (reversing because ALJ had disregarded evidence undermining the finding that plaintiff was not disabled).

In sum, it is not clear whether the ALJ properly considered Dr. Burleson's medical opinion under 20 C.F.R. § 404.1527(c)(1)-(6) and why the ALJ disregarded Dr. Burleson's assessment and diagnosis without explanation. Accordingly, remand is necessary for the ALJ to sufficiently explain any weight to be afforded to Dr. Burleson's opinion.

### D. Other Issues

Because the Court remands on the errors identified above, it need not explore in detail the other arguments posited by Claimant on appeal since the analysis would not change the result in this case. Neither the Commissioner nor Claimant should draw any conclusions from the Court's decision not to address Claimant's other arguments. Nor, obviously, is the Court making any determination about whether or not Claimant is disabled.

In conclusion, the Court expresses no opinion about the decision to be made on remand but encourages the Commissioner to consider all the evidence in the record, expand the record if necessary, and build a logical bridge between the evidence and her ultimate conclusions, whatever those conclusions may be. *See, e.g., Myles v. Astrue*, 582 F.3d 672, 678 ("On remand, the ALJ

should consider all of the evidence in the record, and, if necessary, give the parties the opportunity to expand the record so that he may build a 'logical bridge' between the evidence and his conclusions"); *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994).

## IV. CONCLUSION

For the reasons stated above, Claimant's Motion for Summary Judgment is granted [ECF No. 12], and the Commissioner's Motion [ECF No. 26] is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Amended Memorandum Order and Opinion.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated: June 18, 2019